IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**DENISE MANNARINO**,
        Plaintiff,

      v.                        Case No.  C2:20cv5476

**THE VILLAGE OF**            Judge
**MINGO JUNCTION, OHIO**,     Magistrate Judge

      and

**POLICE OFFICER**
**DOUGLAS HARDSOUK**,          **COMPLAINT AND**
                                 **JURY DEMAND**

      and

**POLICE OFFICER**
**JOHN MARRINER**,
        Defendants.

## JURISDICTION

1.     This is a police misconduct case, alleging false arrest without probable cause.  The Plaintiff alleges that the Defendants violated her rights guaranteed by the Fourth Amendment to the United States Constitution; 42 U.S.C. §1983; and Ohio tort law. This Court has jurisdiction pursuant to 28 U.S.C. §§1331, 1343 and 1367(a).

## PARTIES

2.     Plaintiff Denise Mannarino is a citizen of the United States and a resident of the Village of Mingo Junction, Ohio, in Jefferson County.

3.     Defendant Village of Mingo Junction, Ohio is a municipal corporation and a political subdivision of the State of Ohio pursuant to Chapter 2744, Ohio Revised Code. It was at all times relevant the employer, master and principal of Defendants Hardsouk and

Marriner.

4.     Defendants Hardsouk and Marriner were at all times relevant employees, servants and agents of the Village of Mingo Junction, employed as police officers. They are sued in their individual capacities.

5.     Defendants Hardsouk and Marriner at all times relevant herein were acting under color of state law, and within the scope of their employment for the Village of Mingo Junction. Further, all acts of Defendants Hardsouk and Marriner alleged herein were done knowingly, recklessly, in bad faith and/or maliciously; and with callous indifference toward Ms. Mannarino's rights protected by federal and state law.

## FACTS

### A.  Background Information

6.     Plaintiff Denise Mannarino has lived in Jefferson County her entire life. She has lived in the Village of Mingo Junction for nearly 40 years. She attended high school in Jefferson County, and then obtained her associates degree from Jefferson Technical College.

7.     From 2003 through 2011 Ms. Mannarino worked for the Defendant Village of Mingo Junction. She initially worked in the water department for several years doing office and clerical work. Then, from 2008 through 2011, she was hired as the full-time Police Secretary by the Mingo Junction Police Department. In that position she worked directly with the former Chief of Police and also assisted in the operations of the weekly Magistrate's Court. She left her employment at the Village to take an office position with the Jefferson County Behavioral Health System and, for the last approximately seven years

2

she has held a similar position with an area Cancer Center.

8.    Aside from the arrest which occurred in this case, Ms. Mannarino has never been arrested in her life.  She has never been charged with or convicted of any crime in her life.  Other than her experience herein with Defendants Hardsouk and Marriner, Ms. Mannarino has never been locked in handcuffs, never been locked and transported in a police cruiser, never been in a jail or locked in a cell.

9.    In 1982 Denise married Joe Mannarino.  Mr. Mannarino has lived in Mingo Junction his whole life.  He is 63 years old.  He worked for many years in the local Wheeling-Pittsburgh Steel Mill, as had his father before him. Since the reductions and closings in the area steel industry, Joe has been employed in the oil and gas industry. Mr. Mannarino's father and brother were both members of the Mingo Junction Village Council, and for many years Joe served as the fiscal officer for Steubenville Township.  Like the Plaintiff, Joe Mannarino had never been arrested before the incident herein, and he has no criminal record of any kind.

10.    Ms. Mannarino and her husband have three children, all adults.  Their oldest son, age 31, obtained a masters degree in epidemiology, and works in the public health and safety field for the U.S. Surgeon General.  Their daughter, age 28, received a psychology degree from Kent State University and teaches at a private school in Pittsburgh. Their youngest son, named Austin, is 24 years old and lives with Plaintiff and her husband in Mingo Junction.

11.    During and after high school, Austin has been employed in a number of jobs, including work for Jefferson County and then for the Village of Mingo Junction, doing things such as cutting grass and reading water meters.  His parents assisted him in enrolling at

the Eastern Gateway Community College, where he studied welding.

12.     During high school Austin began to express an interest in firefighting. His parents assisted him in joining the Mingo Junction Fire Department and the nearby Hillendale Fire Department as a non-certified volunteer, positions that Austin continues to serve in. During the years after high school Austin also spent time at the Mingo Junction fire station watching and talking with the Village employees there. He very much wanted to befriend the professional firefighters, and become one of them. His parents were encouraging. Austin and his father worked together, studying countless hours to take the Ohio firefighter's qualification test. Applicants needed a score of 60 to qualify, but Austin got a score of 58.

13.     At the beginning of 2019 Austin's parents were able to secure for him a well-paying job in the JSW Steel facility in Mingo Junction. Austin began in January and worked there until October. Because he was inexperienced with money and somewhat gullible or easily influenced, Denise Mannarino and her husband had set up a savings account years earlier, in both of their names, for Austin. He would deposit his paychecks, and a small portion went on a debit card for Austin to spend for personal expenses, and he continued to live at home at no expense. By October of 2019 Austin had accumulated savings of almost $30,000.00.

14.     That fall the Mannarinos' older son was working on an assignment in Fairbanks, Alaska. He would be returning from Alaska by the end of the year. The Plaintiff and her husband decided to plan a trip to visit him, and they invited Austin to go with them. They felt it would be a memorable family trip, and they offered to pay all of the costs for Austin to go along. Austin seemed genuinely excited. He asked his supervisor for time off

4

so that he could visit his brother in Alaska, and the vacation days were approved. Mr. and Mrs. Mannarino purchased tickets for the flight and made all the necessary arrangements.

15. In October the Mingo Business Association held a Halloween-themed fundraising event, a "haunted maze". Austin agreed to work there on a voluntary basis. On one of the days during the haunted maze fundraiser Austin's employer advised him that he was needed to work overtime. This was mandatory under the JSW Company's contract and Austin was required to work the additional hours. However, rather than risk displeasing the people at the Halloween fundraiser, Austin refused to work overtime, knowing that it would result in the termination of his employment at JSW Steel, which is what occurred. For days thereafter, Austin tried to deceive his parents by pretending to go to work, but they soon heard about his firing. Since the end of October, 2019, Austin Mannarino has been unemployed and continuing to live at home.

### B. The Events of November 21-22, 2019

16. The Mannarino family was scheduled to leave for Alaska on Saturday, November 23, 2019. Plaintiff and her husband were excited about this vacation and Austin looked forward to it as well. He had never said anything negative about going to Alaska. However, during the week prior to the trip events took an unexpected turn.

17. Austin had been going down to the City Building and spending a lot of time hanging out with the guys at the fire station. During the course of their conversations Austin had revealed to them that he had over $28,000.00 in the bank. One of those firefighters had an old, used pickup truck, and he and the others began an aggressive effort to convince Austin to pay an exorbitant amount of money and buy the truck. Austin did not own a vehicle, he drove a pickup belonging to his parents.

5

18.     In speaking with the others at the City Building, Austin had mentioned that he was going to Alaska with his parents to visit his brother.  Believing that Austin was spending his own money on the trip, and in furtherance of the scheme to talk Austin into paying all or most of his savings for the used truck, the group at the City Building worked to persuade Austin that he should refuse to go to Alaska and that he should not permit his parents to participate in his financial affairs.  Manipulating Austin's desire for their friendship, they convinced him to refuse to go to Alaska with his parents.

19.     On the evening of Thursday, November 21, at approximately 8:30 p.m., Austin called his father from the Mingo Junction City Building and, in the presence of the others, announced that he was not going on the trip.  He said that the people down at the firehouse had told him it was cold up there and that he shouldn't go, and so he had decided he wasn't going.  Mr. Mannarino told Austin he was going, to come home and talk about it, and to bring the truck he was driving and the phone he was using (both of which belonged to his parents) home.  Austin refused and either Austin or someone with him terminated the call.

20.     Joe went inside and reported this to Plaintiff Denise Mannarino.  Both she and her husband tried several times to call and text their son, but he would not answer them.  Ms. Mannarino drove down to the City Building, which is only a short distance from their home, to speak with her son.  This was just minutes after Austin had called to announce his decision.  Knowing their son as they do, they felt certain that for some reason he was being bullied or manipulated into making this statement.

21.     Ms. Mannarino pulled into the parking lot and saw a group of 6 to 7 young men standing outside the City Building, which houses both the Fire Department and Police

6

Department. Plaintiff saw her son in the group, standing with an acquaintance named John Wright, Jr. Mr. Wright is a Mingo Junction firefighter and believed to be the individual who was attempting to sell the truck to Austin.

22. From her car Ms. Mannarino made several attempts to call Austin, but he would not answer although he could clearly see her sitting in her car. She watched the group, including her son, go into the building. A short time later they came back outside and moved to a position behind a truck. Then the Plaintiff received a text from her son's phone saying "you come over here." Ms. Mannarino believes that this was actually sent by one of the others, not by Austin.

23. Ms. Mannarino did not get out of her car and walk over to speak with her son in the middle of that group. Instead, she called her husband. She said that Austin was with his friends and she did not think she should do anything to embarrass him. She returned home.

24. When she got home the Plaintiff made another call attempting to speak with her son. This time he answered. They spoke very briefly and she asked Austin to come home so that they could talk about their trip to Alaska. Then another person got on the phone, presumably one of the group of Fire Department employees that Austin was with. This man began to berate Ms. Mannarino, telling her that she should not talk to her son like that because "he's 23 years old, and if he doesn't want to go to Alaska it's his money and he doesn't have to."

25. Ms. Mannarino asked who she was speaking to. The man told her "don't worry about it." The Plaintiff advised this unknown individual "that 23-year-old lives in my house, that's my phone, and we own the truck he's driving", and she told him this was none

of his business. Her husband was standing with her during this conversation and she handed the phone to him.

26. Joe Mannarino asked the man on the phone to put his son back on the line. Rather than do so, the unidentified person suggested in a threatening manner that Mr. Mannarino should come to his house and they could "straighten this out." Wishing to identify the person to whom he was speaking, Plaintiff's husband asked where the man lived. He said "501 Commercial Street", which is the address of the Mingo Junction City Building. Mr. Mannarino terminated the conversation, returned the phone to his wife and went to watch television and try to put this out of his mind for the time being.

27. By now it was after 10:00 p.m. Plaintiff Denise Mannarino went upstairs to get ready for bed. Before getting into bed she tried one last time to call her son, and speak with him about why he was suddenly refusing to go with them to Alaska. Austin answered this call. Ms. Mannarino began to speak with him but almost immediately another voice came on the line. Unlike the earlier caller this man identified himself as Defendant Officer Hardsouk of the Mingo Junction Police Department.

28. Defendant Hardsouk began scolding and threatening Ms. Mannarino. He specifically referenced Austin's savings. Officer Hardsouk told the Plaintiff that Austin was 23 years old and that "it's his money". He advised the Plaintiff that she and her husband could not control their son's bank account, and he threatened to charge her with some crime in connection with Austin's money. He mentioned some offense but Plaintiff does not recall what it was. Defendant Hardsouk also threatened to arrest her for domestic violence. Ms. Mannarino ended their conversation, hung up the phone and went to bed.

29. Some time after 11:00 p.m. there was a loud pounding on the front door of

8

the Mannarino home.  Plaintiff Denise Mannarino got out of bed and joined her husband in answering the door. Defendants Officer Hardsouk and Officer Marriner were on the porch, in uniform, and their cruiser was parked in front.  Defendant Hardsouk appeared agitated.  He told the Plaintiff's husband that he was under arrest for domestic violence and aggravated menacing.  Mr. Mannarino said "I'll get my shoes" or words to that effect, and turned to retrieve them.  Defendant Hardsouk said "you're not getting your shoes."  Mr. Mannarino said he was not going out in bare feet.

30.     Defendant Hardsouk then walked from the porch into the Plaintiff's home, without seeking or obtaining consent, and followed Joe Mannarino as he went and put on footwear.  Defendant Marriner also entered the Plaintiff's home without consent or any other legal justification.  Officer Hardsouk followed Mr. Mannarino back through the house to the front porch, handcuffed the Plaintiff's husband on the porch, and took him to the cruiser.

31.     Next, Defendant Hardsouk re-entered the residence, approached Ms. Mannarino, and advised her that she was also under arrest.  The Plaintiff asked him why she was being arrested and Hardsouk gave no response.  He handcuffed Ms. Mannarino behind her back tightly.  He then locked Plaintiff's front door from the inside and both officers walked Ms. Mannarino back through the Plaintiff's home to the door leading to the garage, and exited through the garage.  They left the Plaintiff's dog locked inside the house unattended.

32.     Ms. Mannarino was led to the cruiser in handcuffs, in the custody of two uniformed officers, in full view of the neighboring homes and passing traffic, and locked in the backseat next to her husband.  Mr. Mannarino was dressed only in a t-shirt, sweatpants

9

and shoes. The Plaintiff was dressed in her pajamas and slippers. The officers got in the cruiser and they drove away.

33.     Often on misdemeanor charges Mingo Junction police will transport the arrestee to the police station, at the City Building, to be processed, charged, and released on a summons. This is particularly so with persons who are cooperative, who are Village residents, who are entirely sober, and who have no prior criminal record. However, the Plaintiff and her husband soon realized that they were not being taken to the Mingo Junction police station. They were being taken out of town to the Jefferson County Correction Center in Steubenville. Ms. Mannarino asked why they were going to the county jail when they could have been taken to the Mingo Police station to prepare the charges, but the officers refused to answer.

34.     During the drive to Steubenville, Plaintiff's husband inquired of the officers what their bail bond would be. Defendant Hardsouk said there would be no bond until they went to court. Throughout the arrest and transport of the Plaintiff Defendant Hardsouk was both rude and intimidating in his demeanor and tone toward the Mannarinos. In addition, throughout the transport Ms. Mannarino's handcuffs were painfully tight. She was required to more or less sit on them while tightly belted into the back seat, and they cut into her skin causing marks that remained even after the cuffs were removed.

### C.  The Experience in Jail

35.     When they arrived at the county jail Plaintiff and her husband were driven into a sallyport, removed from the cruiser, and taken into the jail. They remained in cuffs for some time while Defendant Hardsouk prepared his intake report for the jail staff. It is attached hereto as Exhibit 1. Defendant Hardsouk personally authored the contents of this

10

document, it is in his handwriting and he signed it at the bottom verifying its accuracy. The intake report is addressed "To the Sheriff of Jefferson County". It lists Defendant Hardsouk as the "arresting officer" and Mingo Junction as the "arresting agency."

36. Defendant Hardsouk stated on the intake report that Plaintiff Denise Mannarino was arrested for "Violation of Revised Code Sections: Domestic [violence], Agg Menacing". He reported that those charges were "pending". These statements to the jailers were entirely false. Ms. Mannarino had never committed domestic violence, aggravated menacing, or any other crime, and the Defendants knew it. Further, neither the listed charges nor any other charges were pending when the Defendants had Ms. Mannarino and her husband incarcerated in the Jefferson County Correctional Center. As described more fully below the Defendant officers never brought, or caused to be brought, any criminal charges against the Plaintiff or her husband.

37. The County Jail had a standard bond schedule available to be used by the officers for misdemeanor offenses. However, Defendant Hardsouk opted to have Mr. and Mrs. Mannarino held in jail with no bond until they went to court, where a judge would establish the bond. He wrote "Bond $ None" on the intake report. The court with jurisdiction over misdemeanors arising in Mingo Junction is County Court District #2. That court next convened to handle criminal arraignments on the following Monday, November 25, 2019 at 3:00 p.m. Defendant Hardsouk set that as the date and time when the Mannarinos would appear and have a bond set. (See Exhibit 1). This meant that Plaintiff would remain incarcerated for four days and nights, and Defendant Hardsouk knew this. It also meant that the Mannarinos would be in jail when their plane left that Saturday morning for Fairbanks, and they would thus lose their vacation. Defendant Hardsouk knew

11

this as well.

38.     After the arrest, Defendant Officer Hardsouk contacted Austin and notified him that his parents had been arrested and jailed. Hardsouk filed Exhibit 2 (attached) confirming that he had notified "the victim".  This also was notice to Austin that the trip to Alaska was off.  After receiving this information then, Austin and one of the Mingo Fire Department employees went to the Mannarino home.  They entered and took certain items.  They also took the Plaintiff's dog and went to a neighbor's house where they asked the neighbor to keep it over the weekend.  The neighbor, who had apparently seen the earlier police presence and Plaintiff's arrest, asked Austin what was going on.  The Fire Department employee answered for Austin, and told her that it was none of her business. That night and for the next several nights Austin slept at the Mingo Fire Department and/or at the homes of the Fire Department employees involved in this incident.

39.     Attached as Exhibit 3 are the jail records for the Plaintiff indicating that the jailers accepted and followed the instructions given by arresting Officer Defendant Hardsouk.  On the second page the jail listed the "Bond amount" as "$0.00".  They listed two charges pending, Domestic Violence (M1) in violation of Section 2919.25 O.R.C., and Menacing (M4) in violation of Section 2903.22 O.R.C.  They listed the "Disposition" as arraignment in District 2 Court on 11/25 at 3:00 p.m.  The "Arrest type" was to be "Full Booking". (Exhibit 3, pg. 1) The Plaintiff and her husband were told they would be held until arraignment on Monday afternoon, and at that point they were separated from each other. This information was both heartbreaking and infuriating for the Plaintiff.  She knew that this was intentional on the part of Defendant Hardsouk and a continuation of the threatening conversation he had with her earlier on the phone.

40.     Ms. Mannarino was fingerprinted and "mug shots" of her were taken. She was required to take a shower under the supervision of jail staff, her pajamas and slippers were taken from her and she was dressed in standard jail garb. She was issued 2 blankets, a mattress, toilet paper, soap, a towel, a toothbrush and toothpaste. (See Exhibit 4, attached) She was locked in a holding cell, crying, while she awaited being moved into a cell in the general population of female inmates. She was scheduled to work at her job that day, and feared the loss of her employment for failure to show up for her shift.

41.     Joseph Mannarino was put through all of the same standard jail booking procedures as his wife. He was, however, permitted to use the phone. He contacted his sister-in-law who is a long-serving Deputy Clerk of Courts in the County Courts system. He told her what had happened. She in turn called the Judge of the District 2 County Court at his home. He was kind enough to get up in the middle of the night and call the county jail on a back line. He advised the jail staff of who was calling and entered a verbal order for the release of Mr. and Ms. Mannarino immediately, on their own recognizance. This was done, and the Plaintiff and her husband were released. They called their nephew, who is a Steubenville Police Officer, and lived nearby. He came to the jail and picked them up, and they were back at home before morning on Friday, November 22.

42.     The Plaintiff and her husband left that Saturday for Alaska. They visited their other son and returned home about a week later. Austin did not go. He called his parents the day after they left, while they were in Fairbanks, apologizing and asking if he could return home. They agreed, and Austin has lived at home, supported both personally and financially by his parents, ever since.

### D.  No Probable Cause

43.     In his treatment of Plaintiff Denise Mannarino herein, Defendant Hardsouk was motivated by improper and malicious concerns.  He was fully aware that the initiating issue was really about Austin Mannarino's bank account, and about getting Austin to spend the money in that account on a vastly over-priced pickup truck being sold by one of Hardsouk's friends and fellow safety forces at the Village of Mingo Junction.  Hardsouk was acting solely at their behest, using his official police powers in order to assist someone he knew in swindling Austin out of his savings.  This was evidenced clearly by Defendant Hardsouk's reference to Austin's bank account, and his right to spend it any way he wished, during the police officer's phone conversation with Ms. Mannarino less than an hour before he arrested her.

44.     The group of Mingo Junction employees at the City Building that night perceived it as beneficial to their scheme if Austin did not travel to Alaska.  Defendant Hardsouk's arrest and incarceration of the Plaintiff was designed to assist in achieving that result.  It was this set of ulterior motives which led to Plaintiff's arrest, not a good-faith effort by the officers to enforce the law.

45.     There was never any evidence, facts, or circumstances known to the Defendant police officers which would create probable cause to arrest or prosecute Ms. Mannarino for domestic violence, aggravated menacing or any other crime.  She had done absolutely nothing wrong and the Defendants knew it.  Having succeeded in incarcerating Austin's parents for what he believed would be several days, Defendant Hardsouk's true goal of disrupting the family vacation had apparently been accomplished.  He never proceeded to file any prosecution against either Mr. or Mrs. Mannarino, because that was

14

never the intent from the beginning and Hardsouk had no probable cause which would support such a prosecution.

46.    Attached as Exhibit 5 is a copy of the Village of Mingo Junction Ordinance No. 537.19 stating the offense of "Domestic Violence." Defendant Hardsouk's police report, filed to justify the arrest of Ms. Mannarino, referenced only the conduct asserted in subsection (c). The essential elements of that offense are as follows:

> (C) No person, by threat of force, shall knowingly cause a family or household member to believe that the offender will cause imminent physical harm to the family or household member.

At the time when they arrested the Plaintiff, the Defendant police officers had no probable cause to believe that Denise Mannarino had violated this ordinance. Neither Austin nor anyone else had reported that Denise had threatened to use force on her son, or that she had caused him to believe that she ("the offender") would cause imminent physical harm to him (the purported victim). There was no factual basis whatsoever to support the arrest of the Plaintiff for domestic violence.

47.    Attached as Exhibit 6 is a copy of the Village of Mingo Junction Ordinance No. 537.05, stating the offense of "Aggravated Menacing". Defendant Hardsouk's police report listed this crime as a further justification for the arrest of the Plaintiff. The essential elements of this offense are as follows:

> No person shall knowingly cause another to believe that the offender will cause serious physical harm to the person or property of the other person. . .

At the time when they arrested the Plaintiff, the Defendant police officers had no probable cause to believe that she had violated this ordinance either. Neither her son nor any other person had reported that Denise had knowingly caused Austin to believe that she

("the offender") would cause serious physical harm to Austin (the supposed victim). There was no factual basis whatsoever to support the arrest of the Plaintiff for aggravated menacing.

48.     In truth, Plaintiff and her husband had spanked Austin only a handful of times during his childhood. Since he was a boy neither his mother nor father had ever had any forceful, or violent, or aggressively physical contact with Austin at any time, not even once. Obviously Austin knew this and was aware that neither of his parents had ever struck, assaulted or physically accosted him, even in anger.

49.     As a proximate result of the said acts by the Defendants Ms. Mannarino has suffered severe and sustained injuries. All of the experiences described above were terribly humiliating to the Plaintiff. Her personal freedom of movement and personal security were taken from her by armed representatives of a local government which she had previously been a part of and trusted implicitly. This occurred completely unexpectedly, and out of the blue, and it occurred in spite of the fact that she was a respected, law abiding member of the community who had done nothing wrong to cause or deserve such mistreatment. It has had a profoundly disturbing effect upon Denise Mannarino.

50.     Living in a small community for so long, Ms. Mannarino had a certain expectation of safety and respect which is now shattered. Her being taken from her home in handcuffs, under arrest, is widely known throughout the Village of Mingo Junction. The fact of her arrest and incarceration on charges of domestic violence and aggravated menacing was reported in the largest and most widely read newspaper in the County. That same information was posted on the Jefferson County Sheriff's Facebook page. Friends

and family contacted the Plaintiff beginning the morning after the arrest to ask her what had happened, was she alright, and she was asked about it by people at work, and by neighbors. She was forced to suffer through dozens of tearful and humiliating conversations. This was, and remains, and will continue to be a source of great embarrassment to the Plaintiff.

51.     Denise Mannarino now has an arrest record, accessible to the public, to private agencies and prospective employers, and to governmental agencies. Her fingerprints were submitted to regional and national databases, and remain on file even though no charges were ever filed. These new, negative records were all created and caused by the Defendants. They will have effects upon the Plaintiff for the rest of her life. She will not always know who has seen them or considered them in their dealings with her. For example, when her husband Joe recently went to get his conceal carry permit renewed, his fingerprints from this arrest popped up and his request was denied.

52.     Ms. Mannarino has suffered and will continue to suffer physical, emotional, and mental harm, during and since the events described above, as a proximate result of the actions of the Defendants. These include physical pain and suffering, fear, mental anguish and anxiety, physical tension and stress, embarrassment, humiliation and upset.

## FIRST CLAIM - ARREST WITHOUT
## PROBABLE CAUSE - FOURTH AMENDMENT VIOLATION

53.     The said acts by Defendants Hardsouk and Marriner constitute an arrest of Plaintiff Denise Mannarino without probable cause, in violation of the Fourth Amendment and 42 U.S.C. §1983.

## SECOND CLAIM - UNLAWFUL ENTRY INTO PLAINTIFF'S
## HOME - FOURTH AMENDMENT VIOLATION

54.     The said acts by Defendants Hardsouk and Marriner constitute an unlawful

warrantless entry into the Plaintiff's home, without consent, exigent circumstances or any

other constitutionally permissible basis, in violation of the Fourth Amendment and 42

U.S.C. §1983.

## THIRD CLAIM - FALSE ARREST IN VIOLATION
## OF OHIO LAW

55.     The said acts by Defendants Hardsouk and Marriner constitute the tort of

false arrest under Ohio law.

## FOURTH CLAIM - *MONELL* CLAIMS OF
## EMPLOYER LIABILITY UNDER §1983

56.     The said acts by Defendants Hardsouk and Marriner were proximately

caused by preexisting acts, customs and policies of Defendant The Village of Mingo

Junction, including acquiescence in unconstitutional practices, ratification of

unconstitutional practices, inadequate screening and hiring procedures, inadequate

training, inadequate supervision and discipline, with deliberate indifference to the rights of

citizens including residents of the Village.

57.     Defendant Hardsouk was selected for hiring at age 22.  Defendant Village of

Mingo Junction was aware prior to hiring Defendant Hardsouk that Hardsouk already had

a documented and often-repeated history of intimidating behavior toward other persons in

his employment setting, including even his supervisors.  They also knew that he had

demonstrated a willingness to be untruthful with the Village of Mingo Junction Police

Department if he thought it would be to his benefit. And he further had a demonstrated history of disrespect for the requirements of the law.

58.     In his employment application with the Village, Hardsouk was required to list all his prior employments, including the reasons for leaving. He listed four prior jobs, and no negative information about his work record at those employments. However, in his pretest interview prior to taking a polygraph exam in Columbus, contrary information came out. It was revealed that Hardsouk had worked at Walmart for 7 months, and that employment ended just a few months before he applied to be a Mingo Junction Police officer. His supervisor at Walmart stated that Hardsouk "was intimidating" whenever the supervisor discussed issues with him. He had received four documented disciplines in his short employment there, and three of them were "for having an intimidating attitude toward his supervisor."

59.     It was also revealed that Hardsouk failed to disclose in his employment application with the Mingo Junction Police three other jobs he had previously held. He had worked for Pennsylvania Drilling Company, but he failed to disclose that job on his application feeling that "the company may give him a negative reference." He had worked for Kentucky Fried Chicken, but he failed to disclose that prior job on his application, also feeling that "the company may give him a negative reference." He had also worked for McDonald's. During his employment there he admitted to having received either four or five disciplines for "disagreements with management." He had also failed to disclose this prior employment on his application to the Village of Mingo Junction Police Department.

60.     In his initial application interview with the Mingo Junction Police Department Hardsouk had been asked if he had ever indulged in illegal drugs or drank alcohol and if

19

so how much and how often. He falsely minimized his experience, stating he had smoked marijuana a small number of times as a minor.  During the pre-polygraph interview and in the polygraph test itself, Hardsouk's dishonesty on this point was disclosed.   In the interview, Hardsouk revealed that he was placed on a diversion program for possession of marijuana by the Weirton, West Virginia Police Department.  He admitted that as recently as one month before taking the polygraph test, he had violated his concealed carry permit by carrying a loaded 9 m.m gun on his person while drinking alcohol.  He admitted to purchasing and furnishing alcohol to minors on multiple occasions. He admitted to illegally providing prescription medications to others on several occasions, most recently just "a couple of months ago while in the police academy."

61.     During the pre-polygraph interview Defendant Hardsouk did deny the unlawful use of prescription drugs without a prescription, and he denied that he was concealing any additional information about the use or sale of illegal drugs.  However, Hardsouk was then examined on the polygraph, and given three (3) separate tests, by an experienced and licensed member of the Academy of Certified Polygraphists.  The examiner reported this: "After a careful interpretation of Douglas A. Hardsouk's polygraph charts, specific reactions were noted on his answers to some of the pertinent questions that would indicate a deliberate attempt at deception. Since these reactions did occur, it is my opinion Douglas A. Hardsouk **did not tell the truth** during his polygraph examination".   One of the questions to which Hardsouk had given consistent dishonest reactions was: "Are you now concealing any information about the use or sale of illegal drugs?"  After the tests, when confronted with his false answers, Defendant Hardsouk eventually admitted his answers were dishonest.  The polygraph expert's report stated that, when asked why he answered

20

dishonestly, "he had no excuse other than to state he wasn't sure how Mingo Junction Police Department would take it."

62. Knowing all of the above, including the applicant's admissions that he had a documented pattern of intimidating conduct toward people in his prior employments, and that he had intentionally tried to deceive this prospective employer about that prior intimidation, and about involvement in criminal drug activity, and other improprieties, a reasonable policymaker would have concluded that a likely consequence of a decision to select this candidate for hiring as a police officer would be a continuation of similar intimidating conduct and dishonesty in his police work, leading to constitutional violations such as he committed upon Denise Mannarino.

63. It was also known to the Mingo Junction Police Department prior to hiring the Defendant that, by the age of 22, Hardsouk had been involved in four property damage accidents and was at fault in three of them, and had received several traffic citations. The job for which Hardsouk was applying was "patrol officer", a position which required nearly constant operation of a motor vehicle on the streets of this community. While the particular injury done to Ms. Mannarino herein was not motor vehicle related, Hardsouk's documented bad driving record was yet another reason that a reasonable policymaker would have recognized the obvious likelihood of future similar issues and would have hired an applicant who did not have these problems, instead of Defendant Hardsouk.

64. Nevertheless, in spite of his awareness of all of the facts described above, and even though Defendant Hardsouk had no experience whatsoever in the field of law enforcement, the police chief selected Hardsouk to fill the vacancy at the Mingo Junction Police Department. The chief of police was the highest-ranking policymaker in the

department.

65.     Having chosen this Defendant for the job, the Defendant Village then provided him with no training classes or courses at all related to the limits of his authority as a police officer, the constitutional rights of citizens, probable cause to arrest, search and seizure, or any of the other law enforcement standards relevant to the claims of Denise Mannarino herein. Neither did the Defendant Village provide Hardsouk with any training courses related to truthfulness, ethics in police work, or other topics directed toward his prior history of work-related dishonesty and intimidation.

66.     Supervision of Defendant Hardsouk's work performance has been entirely inadequate and ineffectual.  For many or most of his working hours there has been no on-duty supervisor at all.  The Mingo Junction Human Resource Manual calls for monthly performance reviews for police officers.  Those who conduct the performance ratings are required to be in a position to measure the performance of the employee they are rating, and the employee is to review their evaluation forms.  However these were never actually conducted.  Defendant Hardsouk's personnel file contains no supervisor's performance review or evaluation of the quality of his work.  From his appointment in November of 2017 through the present, there are no monthly performance reviews conducted by any other Village employee regarding Defendant Hardsouk's performance of his job, or whether problems and inadequacies have been apparent.

67.     During the time of Defendant Hardsouk's employment there has also been an absence of adequate investigation and discipline of police officers' policy violations and other misconduct.  Complaints have been made to Village personnel, including the police chief, regarding the actions of Defendant Hardsouk, but no records of any such events

22

have been created, no investigations have been documented, and no disciplinary actions have been taken.  During the time that Defendant Hardsouk has been a Mingo Junction police officer, there has been a customary practice of failing to investigate complaints and impose appropriate discipline.

68.     That customary practice was followed in the present case as well.  On the day after the arrest of the Plaintiff her husband spoke to the Chief of the Mingo Junction Police Department.  This was Friday, November 22, 2019, only hours after Mr. and Mrs. Mannarino had come home from the jail.  Joe Mannarino complained about what had happened, including the groundless arrest of his wife.  The Chief of Police revealed that he was already fully aware of the events of the night before, including the fact that it had actually arisen as a result of the scheme to bilk the Plaintiff's son Austin out of his money. The Chief even knew the details of the scheme, telling Mr. Mannarino "that truck isn't worth that much."  The Chief further indicated his knowledge that the accusations upon which the arrest of the Plaintiff was based were not valid, by stating that he knew charges would never be filed.

69.     Nevertheless, in spite of his admitted knowledge of an ulterior motivation and an arrest based on allegations which could never be prosecuted, neither the Chief of Police nor anyone else ever conducted any investigation of the Defendant officers' actions in this case. Neither the Plaintiff nor her husband was ever interviewed, no findings were made and no discipline was imposed.  By ignoring the incident and the Mannarinos' complaint entirely the Defendant Village of Mingo Junction acquiesced in and ratified the misconduct of their employees.  In fact, Defendant Hardsouk was promoted to detective for the Mingo Junction Police Department by the Chief of Police.

23

WHEREFORE, Plaintiff demands judgment against the Defendants jointly and severally for compensatory damages, punitive damages, reasonable attorney fees and the other costs of this action, and for such other remedies as the Court may deem appropriate.

Respectfully submitted,

**/s/ James D. McNamara**
James D. McNamara    (0002461)
Trial Attorney for Plaintiff
88 E. Broad Street, Suite 1350
Columbus, OH 43215
(614) 464-2770
psilbach@yahoo.com

**/s/ Jeffrey Orr Brown**
Jeffrey Orr Brown    (0016762)
Co-counsel for Plaintiff
2017 Sunset Boulevard
Steubenville, OH 43952
(740) 282-1911
brown.jeffrey@comcast.net

## JURY DEMAND

Plaintiff hereby demands a trial by jury of eight (8) persons.

**/s/ James D. McNamara**
James D. McNamara    (0002461)
Trial Attorney for Plaintiff

24